UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DARRELL CARTER                                    CIVIL ACTION

VERSUS                                            NO. 09-4158

MARLIN GUSMAN ET AL.                              MAGISTRATE JUDGE
                                                  JOSEPH C. WILKINSON, JR.


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a civil rights case in which plaintiff, Darrell Carter, alleges violations of his constitutional rights pursuant to 42 U.S.C. § 1983. He seeks compensatory and punitive damages for physical and emotional injuries allegedly suffered in an incident on June 27, 2008, during which he asserts that defendant, Orleans Parish Sheriff's Deputy Jerry Martin, used excessive force against him. Carter also asserts a federal claim of unconstitutional false arrest and imprisonment, and state law claims of false arrest and imprisonment, assault and battery. Orleans Parish Criminal Sheriff Marlin Gusman is also named as a defendant.

This matter was referred to a United States Magistrate Judge for all proceedings and entry of judgment in accordance with 28 U.S.C. § 636(c) upon written consent of all parties. Record Doc. No. 11. Both parties waived the jury demand, Record Doc. No. 18, and trial was conducted before the court without a jury on January 25, 2010. Having considered the written and testimonial evidence adduced at trial, the record, the

arguments and written submissions of the parties, and the applicable law, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.      The following facts, which are hereby accepted and adopted as findings of fact by the court, were listed as "Uncontested Material Facts" by the parties in Paragraph 7 of the Pretrial Order, Record Doc. No. 19 at p. 4.

(a)      On or about June 27, 2008, plaintiff was arrested by Deputy Jerry Martin, for violating New Orleans City Ordinance Section 54-403, for disturbing the peace by communicating threats.

(b)      Plaintiff sought treatment at Children's Hospital for injuries allegedly sustained during this incident.

2.      In reaching the remaining findings of fact, I credit the testimony of the defense witnesses over the testimony of plaintiff's witnesses.

3.      I find that the testimony of Deputy Martin and New Orleans Police Officer Nicole Powell is credible. The bearing, background, demeanor, obvious sincerity and straightforward manner of testifying of these witnesses convince me of their truthfulness. Specifically, both officers' demeanor and their manner of testifying were calm, detailed and specific. Their testimony, the documentary evidence and the surveillance videotape evidence corroborate each other with only minor, insignificant discrepancies. Deputy

Martin's testimony was neither exaggerated nor embellished in his own self-interest. Any inconsistencies between Deputy Martin's and Officer Powell's testimony amount to trivialities that in no way alter my finding that they are credible. Thus, I find the testimony of both officers credible.

4.      In making my credibility choice of Deputy Martin's and Officer Powell's testimony over that of plaintiff and his cousin, Michael Brumfield, and assigning more weight to the defense witnesses' testimony, I do <u>not</u> find that <u>the entirety</u> of their testimony lacks credibility.  On the contrary, much of their testimony (for example, that Deputy Martin asked Carter about a robbery, that plaintiff broke away from Deputy Martin, that plaintiff attempted to leave the scene without answering Deputy Martin's questions, that Deputy Martin had to pull Carter out of his cousin's vehicle, that plaintiff was physically aggressive in defending himself and that Carter was handcuffed by Deputy Martin for no more than 15 minutes) tended to corroborate the deputy's testimony.  On the other hand, certain details in the testimony of both Carter and Brumfield are implausible or exaggerated, such as their testimony that Deputy Martin took off his utility belt and put it in the trunk of his vehicle before assaulting plaintiff and that the "beating" lasted 15 to 20 minutes before New Orleans Police officers arrived at the scene.  Some details of plaintiff's testimony are contradicted by the documentary evidence, such as his testimony that he was "beaten up" and that his bond was not

forfeited. Carter's and Brumfield's bearing, demeanor and manner of testifying, coupled with the implausibility of some of their testimony and the absence of credible corroborating evidence, all lead me to credit the testimony of the two defense witnesses over that of Carter and Brumfield.

5.     Based on the credible testimony of Deputy Martin and Officer Powell and the other record evidence, including the surveillance videotape from the convenience store where the incident occurred, I find that Deputy Martin had reasonable suspicion to stop and question, and had probable cause to arrest and imprison plaintiff, Darrell Carter. I further find that Deputy Martin did _not_ use excessive force and did _not_ commit either an assault or a battery against Carter during the subject incident.

6.     At about 1:00 a.m. in the early morning of June 27, 2008, plaintiff was arrested on Bourbon Street in the French Quarter of New Orleans for obstructing a public place. He was booked into Orleans Parish Prison ("OPP") and was released from jail about 10:00 p.m. that same date.

7.     Upon his release, Carter called his cousin, Michael Brumfield. He asked Brumfield to pick him up at Quicky's, a convenience store located near OPP at the corner of Tulane Avenue and Broad Street in New Orleans. Carter walked the two or three blocks from OPP to Quicky's.

8.     On the night of June 27, 2008, Deputy Martin was a six-year veteran assigned to the Criminal Sheriff's Special Operations Division and was detailed to patrol around Central Lockup at OPP.  When Carter was released from OPP, Deputy Martin was parked in a marked Sheriff's cruiser on South Dupre Street near the temporary Central Lockup facility.

9.     Deputy Martin watched as several males came out of OPP and began walking in the direction of Quicky's.  He knew from experience that persons who had just been released from OPP often went to Quicky's to buy cigarettes, use the telephone or wait for a ride.  He also knew that store employees often complained to OPP officers that recently released inmates stole items from Quicky's.

10.     A white or Hispanic male who had just been released from OPP spoke to Deputy Martin as he sat in his parked vehicle.  Although neither Deputy Martin nor Officer Nicole Powell recalled this man's name during their testimony, the man was identified on the affidavit of Carter's arrest that Officer Powell prepared at the time of the incident.

11.     This man told Deputy Martin that, while he was incarcerated at OPP, an unidentified black male inmate either threatened to rob him in the jail, tried to rob him in the jail or threatened to rob him once they were released from jail.  Although the complainant did not speak fluent English and Deputy Martin speaks very little Spanish,

Deputy Martin understood that this man felt threatened by a black male who was among the group of inmates being released from OPP at that time. Deputy Martin understood the complainant to say that he felt unsafe going to Quicky's by himself.

12. As the complainant walked down the street in the direction of Quicky's, Deputy Martin had the impression that the man was going to Quicky's to call for a ride. In his rearview mirror, Deputy Martin saw six to eight black males walking in the same direction behind the complainant. Deputy Martin knew that Hispanic males in New Orleans at that time often carried a lot of cash and were frequent targets of robbery or attempted robbery by released inmates and others. Deputy Martin decided to drive to Quicky's to investigate the complaint.

13. When Carter arrived at Quicky's around 10:30 p.m., Brumfield and his sister were parked in Brumfield's Jeep in front of the store. Brumfield was sitting in the front passenger seat of the car and his sister was in the driver's seat. Brumfield saw plaintiff crossing Tulane Avenue and entering Quicky's parking lot. Carter spoke to Brumfield through the open car window, then went inside the store to buy cigarettes.

14. The complainant was at Quicky's when Deputy Martin arrived. The complainant signaled to Deputy Martin and pointed in the direction of Carter inside the store, giving Deputy Martin the impression that he was identifying Carter as the person who had robbed, tried to rob or threatened to rob him.

15.     Deputy Martin parked next to the passenger side of Brumfield's car. Through the store window, Deputy Martin could see the store clerk pointing in the direction of Carter. This heightened Deputy Martin's suspicions that the complainant's allegations might be true.

16.     When Carter exited the store, Deputy Martin stepped out of his vehicle in Carter's path. The deputy asked Carter whether he had been involved in any theft or robbery or had been in any altercation or confrontation while in the jail, and whether he had any weapons on him.

17.     Carter did not answer Deputy Martin's questions. Deputy Martin perceived that plaintiff's body language became defensive. Specifically, plaintiff turned his back and put his hands in his pockets. Deputy Martin believed at that moment that the complainant had identified Carter as the man who had threatened him. He also had seen the store clerk pointing toward Carter inside the store as the deputy pulled up and parked. Deputy Martin did not know at any time during the incident whether plaintiff was armed.

18.     Deputy Martin instructed Carter to put his hands on the cruiser. Carter did not comply. Deputy Martin then reached for Carter, turned him and pushed him down on the hood of the car, so that Deputy Martin could pat him down for weapons. The surveillance videotape, which has no sound, confirms that the ten-second interval between Carter's exit from the store and Deputy Martin's reaching for him was enough

time for the deputy to ask the two questions, for Carter to refuse to answer and become

defensive, and for the deputy to decide to detain physically and search him for weapons.

19.     Still without answering defendant's questions, Carter broke away from

Deputy Martin, walked between the two vehicles to the driver's side of Brumfield's Jeep

and got into the rear seat of the Jeep.

20.     Deputy Martin opened the driver's door of his vehicle and retrieved his

police radio from inside the car.  He did not take off his utility belt at any time during the

incident.  He credibly explained that he would not take off his belt because it was against

departmental policy and because it would deprive him of resources that he might need

during a confrontation, such as additional handcuffs or ammunition.

21.     Deputy Martin went to the driver's side of the Jeep and ordered plaintiff out

of the car more than once.  Carter did not comply.  Instead of getting out, Carter told the

driver to ignore the deputy and to drive away.  When Carter did not comply with the

order to get out of the Jeep, Deputy Martin told him that he was under arrest.  Deputy

Martin then pulled Carter out of the vehicle and struggled to subdue him.

22.     Carter ignored Deputy Martin's questions and instructions, attempted to

leave without cooperating with the deputy and resisted both when Deputy Martin tried

to pat him down and when Deputy Martin tried to pull him out of the Jeep.

23.     New Orleans Police Officer Nicole Powell and her partner were driving by in their police cruiser.  They saw Deputy Martin struggling with Carter and pulled over to assist the deputy.  Officer Powell's partner helped Deputy Martin subdue Carter so that he could be handcuffed.

24.     Deputy Martin then placed his handcuffs on Carter and double-locked the cuffs so they would neither tighten nor loosen when plaintiff moved.  Carter never complained to Deputy Martin or Officer Powell that the cuffs were too tight.

25.     Deputy Martin told Officer Powell that he had been stopped by a male complainant who said that a black male had threatened to beat him up and take his money, if he did not give the black male his money.  Deputy Powell told Officer Powell that the victim had given him a description of the black male who had threatened the victim and who was walking toward Quicky's at the time of the complaint.

26.     Officer Powell discussed the incident with the victim, Deputy Martin and a New Orleans Police Sergeant who had arrived at the scene.  The complaining victim again identified Carter as the man who had threatened him.  However, the victim told the officers that he feared for his safety and did not want to be involved with any investigation of robbery or attempted robbery.  The sergeant decided that Carter should be charged with disturbing the peace by threats, rather than attempted simple robbery.  Carter was arrested on that charge.

27.     Officer Powell prepared the affidavit of arrest, which includes the name and address of the victim as a witness.  Defendant's Exh. 2, Item No. F–35646-08, Municipal Court Case No. 1043607.  The charge of disturbing the peace by threats was consistent with the information provided by the victim and Deputy Martin.

28.     No more than fifteen minutes after plaintiff was handcuffed, the New Orleans police officers removed Deputy Martin's handcuffs from plaintiff, placed one of the police officers' handcuffs on him and gave Deputy Martin's handcuffs to him. Officer Powell and her partner transported Carter to Central Lockup.

29.     Carter testified that he had a "hickey" between his neck and the back of his head where Deputy Martin hit him.  He also said that he has little feeling in the first finger of his left hand since the incident, as a result of the handcuffs being too tight. There is no evidence that he complained of any injuries when he was booked at OPP shortly before midnight on June 27, 2008.

30.     Plaintiff was released from OPP around 2:15 p.m. on June 28, 2008 after his grandmother posted a $300 cash bond.  He went to the emergency room at Children's Hospital about one hour later, complaining to the triage nurse of pain in his forehead and right ear and of loss of feeling in his left hand as a result of being handcuffed.  The emergency room physician noted that plaintiff complained of numbness and tingling in two fingers of his left hand and pain in his left wrist, right upper eyebrow and right ear

after "being beat up by deputy multiple times." Physical examination of Carter's head, skin, ears and neck was normal. Carter exhibited numbness in the back of his left thumb and index finger, but had normal strength in and was able to move all his fingers. The doctor diagnosed neuropathy[1] of Carter's left hand. Plaintiff was discharged in good condition with instructions to take Motrin every eight hours, see his primary care physician in five days for followup and return to the emergency room if his condition worsened. Plaintiff's Exh. 2, Children's Hospital medical records. There are no other medical records in evidence.

31.     In conflict with Carter's testimony that the charge against him of disturbing the peace by communicating threats was dropped and that his bond was not forfeited, the New Orleans Municipal Court Case Chronology Report shows that a trial on the charge was set for September 30, 2008. The same report shows that, on October 1, 2008, Carter was ordered to pay $238 to the Municipal Court Operating Fund and $62 in court costs, and his bond was forfeited. Defendant's Exh. 8, New Orleans Municipal Court Case Chronology Report for Case No. 1043607, charge of 54-403, Disturbing the Peace. There is no indication in the documentary evidence that the charge was dismissed.

_____

[1]Neuropathy is: "1. A classical term for any disorder affecting any segment of the nervous system. 2. In contemporary usage, a disease involving the cranial nerves or the peripheral or autonomic nervous system." Stedmans Medical Dictionary (27th ed. 2000), avail. on Westlaw at STEDMANS 272690.

## CONCLUSIONS OF LAW

1.      This court has subject matter jurisdiction over the federal claims in this matter and supplemental jurisdiction over the state law claims.  28 U.S.C. §§ 1331, 1367. Venue is proper in this district.

2.      Carter alleges that Deputy Martin violated his Fourth Amendment rights by unlawfully detaining and arresting him and by using excessive force against him.  "Both unlawful detention and excessive force implicate the Fourth Amendment's proscription against unreasonable seizures.  '[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.'"  Peterson v. City of Fort Worth, 588 F.3d 838, 844-45 (5th Cir. 2009) (quoting Terry v. Ohio, 392 U.S. 1, 16 n.16 (1968)).

> 3.      The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures.  "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."  The touchstone of the Fourth Amendment is thus reasonableness.  We measure reasonableness "in objective terms by examining the totality of the circumstances."

Id. at 844 (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991); Ohio v. Robinette, 519 U.S. 33, 39 (1996)).

4.     Carter argued at trial that Deputy Martin had no lawful justification to detain him because the deputy had no reasonable suspicion to believe that Carter had committed or was about to commit a crime.

> We face here the kind of officer-citizen encounter that is controlled by <u>Terry v. Ohio</u> . . . .  In <u>Terry</u>, the Supreme Court recognized that "[e]ncounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute crime." <u>Terry</u> itself addressed the kind of informal officer-citizen encounters that arise when officers make on-the-spot observations that require immediate action. In assessing the reasonableness of such actions, "there is 'no ready test.'" Instead, a court must "'focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen.'"  The officer must be able to point to "<u>specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion</u>."  The court then asks: "would <u>the facts available to the officer at the moment of the seizure</u> or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"

<u>Id.</u> at 845 (quoting <u>Terry</u>, 392 U.S. at 13, 20-21, 22 (internal citation omitted); <u>United States v. Rideau</u>, 969 F.2d 1572, 1574 (5th Cir. 1992)) (emphasis added).

5.     "The legality of a 'stop and frisk' requires this analysis:  were the officer's initial actions justified when they occurred, and was there a reasonable relation between subsequent actions and the circumstances that supported the stop?"  <u>United States v. Vickers</u>, 540 F.3d 356, 360 (5th Cir.), <u>cert. denied</u>, 129 S. Ct. 771 (2008) (citing <u>United States v. Brigham</u>, 382 F.3d 500, 506 (5th Cir. 2004) (en banc)).

6.     Initially, an investigatory stop

is proper when "the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." Reasonable suspicion requires less information and certainty than the probable cause needed to make an arrest. . . . "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

Id. at 361 (quoting United States v. Hensley, 469 U.S. 221, 227 (1985); Adams v.

Williams, 407 U.S. 143, 145-46 (1972)) (citing United States v. Jones, 234 F.3d 234, 241

(5th Cir. 2000)).

   7.    A frisk accompanying a stop

is appropriate when the officer fears that the suspect is armed and poses a danger to the officer or others. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.". . . The reasonableness of police conduct includes consideration of "the specific reasonable inferences that the officer is entitled to draw from the facts in light of his experience and training."

Vickers, 540 F.3d at 362 (quoting Terry, 392 U.S. at 27; United States v. Sanders, 994

F.2d 200, 203 (5th Cir. 1993)).

   8.    Whether Deputy Martin could or should have pursued less intrusive means,

such as talking to Carter for a longer time, before commencing the frisk,

does not factor into our analysis. The Supreme Court has instructed that, once an officer has established reasonable suspicion, . . . [the] courts are limited in reviewing how the police choose to alleviate that suspicion if the intrusion is no longer than necessary to dispel the suspicion:

> The reasonableness of the officer's decision to stop a suspect
> does not turn on the availability of less intrusive investigatory
> techniques. Such a rule would unduly hamper the police's
> ability to make swift, on-the-spot decisions . . . and [ ] would
> require courts to indulge in unrealistic second-guessing.

Id. (quoting United States v. Sokolow, 490 U.S. 1, 11 (1989)). Based on the Supreme

Court's similar decision in Sokolow, the Fifth Circuit in Vickers rejected defendant's

argument, which Carter also argues in the instant case, that police officers who had

reasonable suspicion to stop Vickers were obligated to converse with him before they

instructed him to put his hands on the hood of the police vehicle and frisked him. Id. at

359, 362 (citing Sokolow, 490 U.S. at 11).

9. "'[I]f additional reasonable suspicion arises in the course of the stop and

before the initial purpose of the stop has been fulfilled, the detention may continue until

the new reasonable suspicion has been dispelled or confirmed.'" United States v. Jenson,

462 F.3d 399, 404 (5th Cir. 2006) (quoting United States v. Lopez-Moreno, 420 F.3d

420, 431 (5th Cir. 2005)).

10. Actions that may heighten a law enforcement officer's suspicions to a level

sufficient to justify a Terry detention include a suspicious person's evasive or

inconsistent answers, physical evasion or flight from an officer, particularly after being

ordered to halt, or when these types of actions occur in an area known for criminal

activity. United States v. Howard, 340 Fed. Appx. 967, 2009 WL 2482068, at *1 (5th

Cir. 2009) (citing <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000)); <u>United States v. Jones</u>, No. 08-61004, 2009 WL 3199650, at *4 (5th Cir. Oct. 6, 2009) (citing <u>Wardlow</u>, 528 U.S. at 124-25; <u>United States v. Silva</u>, 957 F.2d 157, 160 (5th Cir. 1992)); <u>United States v. Alexander</u>, 589 F. Supp. 2d 777, 787 (E.D. Tex. 2008) (citing <u>Jenson</u>, 462 F.3d at 404).

11.    "An ordinary citizen's eyewitness account of criminal activity and identification of a perpetrator is normally sufficient to supply probable cause to stop the suspect." <u>United States v. Burbridge</u>, 252 F.3d 775, 778 (5th Cir. 2001).  In the absence of circumstances indicating that the eyewitness is not worthy of belief, a witness's information is "generally entitled to a presumption of reliability and veracity." <u>Id.</u> (quotation omitted).  Furthermore, the willingness of the complainants, "ordinary citizens, [to] remain[] available in person throughout the [identification, stop, and search of the suspect] ensured the credibility of the information they provided." <u>Id.</u> at 779.  The same presumption of the reliability and veracity of witness information applies during an investigatory stop, which requires less than probable cause. <u>Vickers</u>, 540 F.3d at 361.

12.    When an eyewitness to a crime orally describes the perpetrator to the police and then identifies the perpetrator by nonverbal signals to the responding officers, "the officers need not take any additional steps to corroborate the information regarding the crime before taking action." <u>Burbridge</u>, 252 F.3d at 778 (quotation omitted).

13.     Applying the foregoing legal standards to the facts established above, just as the Fifth Circuit has held in similar circumstances, I find that "reasonable suspicion existed to believe that [Carter] was engaged in a recently completed [crime], which gave [Deputy Martin] the right to stop him.  Furthermore, [Deputy Martin] did not exceed the permissible scope of the stop when [he] sought to pat down [Carter]."  Vickers, 540 F.3d at 363.

14.     The credible evidence establishes that a Hispanic man complained to Deputy Martin that a black male in a group just released from OPP either threatened to rob or had robbed the victim while they were in OPP, or threatened to rob him once they were outside OPP.  Deputy Martin knew that Hispanic men in New Orleans at that time were frequent robbery victims.  He also knew that Quicky's personnel had often complained that recently released OPP inmates stole things from the store.  When Deputy Martin arrived at Quicky's, the victim pointed toward Carter.  Deputy Martin saw the store clerk also pointing toward Carter inside the store.  Deputy Martin did not know whether Carter was armed.  When Deputy Martin sought to question him, Carter refused to answer, became defensive, put his hands in his pockets and turned away.  Despite Carter's erroneous idea that he need not stop and answer defendant's questions unless he was under arrest, these "specific and articulable facts" reasonably warranted Deputy

Martin in stopping Carter, questioning him and patting him down.  Id.; Peterson, 588

F.3d at 845.

15.     The videotape and the credible testimony establish that Deputy Martin

stopped Carter, questioned him, ordered him to put his hands on the hood of the vehicle

and tried to frisk him within ten seconds of Carter's exit from the store.  Carter contends

that ten seconds was not long enough for Deputy Martin to develop any reasonable

suspicion to stop or frisk him.  I disagree.  Before Carter even left the store, Deputy

Martin had received the victim's identification of Carter and had seen the store clerk

pointing toward Carter, a recently released inmate in a location where recently released

inmates were known to steal items.  In the totality of the circumstances, based on the

facts known to Deputy Martin at the time, the deputy had reasonable suspicion to detain

Carter.  Deputy Martin had no legal obligation to question Carter further before ordering

him to put his hands on the hood of the car to be frisked.  Moreover, nothing in the

evidence establishes that Deputy Martin would not have stopped and questioned other

black males in the group of just-released inmates if plaintiff had cooperated with Deputy

Martin and answered his questions satisfactorily instead of evading him.

16.     To succeed on a claim of false arrest in violation of either the Fourth

Amendment or Louisiana law, plaintiff must establish that Deputy Martin did not have

probable cause to make an arrest for disturbing the peace by communicating threats.[2] Section 54-403 of the Code of Ordinances of the City of New Orleans provides that the crime of disturbing the peace includes the intentional communication to another person of "a threat, either verbally, in writing, or through any other form of communication[,] . . . to kill or murder him or to do him great bodily harm."  Code of Ordinances of the City of New Orleans § 54-403(b)(1).

17.    "To prevail in a § 1983 claim for false arrest, a plaintiff must show that he was arrested without probable cause in violation of the Fourth Amendment." O'Dwyer v. Nelson, 310 Fed. Appx. 741, 2009 WL 412462, at *3 (5th Cir.), cert. denied, 130 S. Ct. 494 (2009) (quotation omitted).  "Probable cause" is defined as a law enforcement officer's reasonable belief that a person has committed a crime.  An arrest is constitutionally valid if, at the moment the arrest was made, the officer had probable cause to make it; that is, if the facts and circumstances within his knowledge and of which he had reasonably trustworthy information at that moment were sufficient to warrant a prudent person in believing that the arrestee had committed or was committing an offense.  Evett v. DETNTFF, 330 F.3d 681, 688 (5th Cir. 2003); Mendenhall v. Riser,

---

[2]Although Officer Powell testified that she made the arrest based on her sergeant's decision, the parties stipulated that Deputy Martin arrested Carter, and the court has accepted that stipulation. Certainly, Deputy Martin collected and developed the facts on which the arrest and charge were based.

213 F.3d 226, 231 (5th Cir. 2000) (citing <u>Hunter v. Bryant</u>, 502 U.S. 224, 228 (1991)); <u>Blackwell v. Barton</u>, 34 F.3d 298, 303 (5th Cir. 1994).

18.     To establish a claim for false imprisonment under federal law, plaintiff must prove (1) an intent by defendant to confine him, (2) acts resulting in confinement, (3) plaintiff's consciousness of confinement or resulting harm, and (4) the deprivation of a constitutional right, such as the right not to be arrested or detained without probable cause. <u>Haggerty v. Texas So. Univ.</u>, 391 F.3d 653, 655-56 (5th Cir. 2004); <u>Brown v. Bryan County</u>, 67 F.3d 1174, 1180, 1181 (5th Cir. 1995), <u>vacated on other grounds</u>, 520 U.S. 397 (1997); <u>Allen v. Normand</u>, No. 09-2825, 2009 WL 2448253, at *13 (E.D. La. Aug. 7, 2009) (Feldman, J.); <u>Whittington v. City of Cuero</u>, No. V-06-0011, 2007 WL 951864, at *8 (S.D. Tex. March 28, 2007) (citing <u>Harper v. Merckle</u>, 638 F.2d 848, 860 (5th Cir. Unit B March 1981)).

19.     To succeed on a claim of false arrest or false imprisonment under Louisiana law, Carter must show that he was detained unlawfully. Detention is unlawful if it is made without color of legal authority. Thus, false arrest or false imprisonment occurs under Louisiana law when a warrantless arrest is made without probable cause. <u>Holloway v. Town of Simmesport</u>, No. CV08-0464-A, 2009 WL 1044554, at *10 (W.D. La. Apr. 17, 2009) (Drell, J.) (citing <u>Dumas v. City of New Orleans</u>, 803 So. 2d 1001, 1003 (La. App. 4th Cir. 2001); <u>Harrison v. Louisiana</u>, 721 So. 2d 458, 461 (La. 1998));

Ketchens v. City of New Orleans, No. 97-0448, 1999 WL 117759, at *3 (E.D. La. Mar. 3, 1999) (Livaudais, J.) (citing Jackson v. Louisiana, 980 F.2d 1009 (5th Cir. 1993)).

20.     Probable cause exists under Louisiana law when the facts and circumstances within the arresting officer's knowledge, and of which he has reasonably trustworthy information, are sufficient to justify a person of ordinary caution in believing that the suspect has committed a crime.  State v. Wilson, 467 So. 2d 503 (La. 1985); State v. Cooper, 2 So. 3d 1172, 1179 (La. App. 2d Cir. 2009); State v. Graham, 820 So. 2d 1101, 1107 (La. App. 5th Cir. 2002).  "[P]robable cause is determined by the setting in which the arrest took place, together with the facts and circumstances known to the arresting officer from which he might draw conclusions warranted by his training and experience. Considering the circumstances, it must be more probable than not that the defendant's activity consisted of criminal behavior."  Cooper, 2 So. 3d at 1179.

21.     Thus, the appropriate inquiry under federal or state law is whether Deputy Martin "had probable cause to believe that" Carter was guilty of disturbing the peace by communicating threats.  Mesa v. Prejean, 543 F.3d 264, 272 (5th Cir. 2008) (emphasis in original); accord State v. Taylor, 962 So. 2d 480, 483 (La. App. 4th Cir. 2007).

22.     In this case, the facts detailed above establish that probable cause existed under both federal and Louisiana law to arrest plaintiff for disturbing the peace by

communicating threats, the same crime for which he was charged.  Because probable cause existed to arrest Carter, no false arrest or false imprisonment occurred.

23.     Carter argued at trial that, because Deputy Martin did not have probable cause to arrest him for disturbing the peace, he had the right to resist the unlawful arrest. "In Louisiana, an individual has a time-honored right to resist an illegal arrest.  However, the right to resist is only available where the arrest is illegal . . . ." State v. Trepagnier, 982 So. 2d 185, 193 (La. App. 5th Cir.), writ denied, 992 So. 2d 1033 (La. 2008) (quoting State v. Ceaser, 859 So. 2d 639, 643 (La. 2003) (internal citations omitted). I have already concluded that probable cause existed to arrest Carter for disturbing the peace.  Accordingly, I find that the arrest was lawful, and Carter had no right to resist. Id.

24.     Carter further alleges that Deputy Martin used excessive force against him. The Fourth Amendment provides a reasonableness standard concerning the use of force. Harper v. Harris County, 21 F.3d 597, 600 (5th Cir. 1994).

25.     "[T]o establish a claim of excessive force, a plaintiff must show that, in addition to being seized, he suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." Peterson, 588 F.3d at 846 (quotation omitted).  "We determine whether the force was excessive 'from the perspective of a reasonable officer on the scene, rather

than with the 20/20 vision of hindsight.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).

26.     "Officers may consider a suspect's refusal to comply with instructions during a [Terry] stop in assessing whether physical force is needed to effectuate the suspect's compliance." Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009) (citations omitted).

> 27.     "In evaluating excessive force claims, courts may look to the seriousness of injury to determine 'whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur.'" Thus, "the extent of [the] injury inflicted" may be considered in determining whether the officers used excessive force.

Id. at 168 (quoting Brown v. Lippard, 472 F.3d 384, 386-87 (5th Cir. 2006) (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986))).

28.     Applying the foregoing legal standards to the facts established above, I find that Deputy Martin's use of force against plaintiff was not excessive to any need and was objectively reasonable under the circumstances. The complaint and crime that sparked the incident were sufficiently serious to prompt Deputy Martin's response. Carter attempted to evade or flee from Deputy Martin's lawful stop and frisk. Deputy Martin did not know whether plaintiff was armed and whether he posed a threat to anyone.

Deputy Martin's use of force to restrain Carter, including grabbing him and pushing him onto the hood of the vehicle, was minimal and reasonable under the circumstances. The resulting injuries, a "hickey" on plaintiff's neck, as he described it, or pain in his left wrist, right upper eyebrow and right ear, as the emergency room physician described plaintiff's injuries, were slight.

29.    As to Carter's allegation that Deputy Martin handcuffed him too tightly, plaintiff testified that he now has little feeling in that finger, and he provided medical evidence that he was diagnosed with neuropathy in the back of his left thumb and index finger around 3:30 p.m. on June 28, 2008. The Fifth Circuit has repeatedly held "that minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force." <u>Id.</u> (citing <u>Freeman v. Gore</u>, 483 F.3d 404, 417 (5th Cir. 2007); <u>Tarver v. City of Edna</u>, 410 F.3d 745, 751-52 (5th Cir. 2005)); <u>accord</u> <u>Glenn v. City of Tyler</u>, 242 F.3d 307, 314 (5th Cir. 2001). It is clear that "'handcuffing too tightly, <u>without more</u>, does not amount to excessive force." <u>Flores v. Palacios</u>, 381 F.3d 391, 398 (5th Cir. 2004) (quoting <u>Glenn</u>, 242 F.3d at 314) (emphasis added). There is no evidence that Carter complained of any pain or numbness in his left hand when he was booked at OPP on June 27, 2008. Furthermore, even if he was handcuffed too tightly by Deputy Martin, which the evidence does <u>not</u> establish, the handcuffing lasted no longer than 15 minutes before

Officer Powell or her partner took Deputy Martin's handcuffs off of plaintiff, replaced them with another set of cuffs and returned the first set to Deputy Martin. Even assuming (without deciding) that plaintiff's injury, if it was handcuff-induced, is more than minimal, the medical diagnosis occurred approximately 17 hours after Deputy Martin's handcuffs were removed from plaintiff, during which time Carter was restrained by a New Orleans police officer's handcuffs for an unknown length of time. In the absence of any other type of excessive force and in the absence of proof that the handcuffing by Deputy Martin caused any serious injury, I find that Deputy Martin did not use excessive force in handcuffing Carter.

30. Battery is a state law tort consisting of harmful or offensive contact with a person, resulting from an act intended to cause him to suffer such a contact. The intention need not be malicious, nor intended to inflict actual damage. Landry v. Bellanger, 851 So. 2d 943, 944 (La. 2003); Brungardt v. Summitt, 7 So. 3d 879, 887 (La. App. 4th Cir. 2009); Bennett v. Ragon, 907 So. 2d 116, 121 (La. App. 1st Cir. 2005).

31. Assault is, generally speaking, threat of a battery. An assault is a threat of such harmful or offensive contact. To establish a claim of assault, plaintiff must prove an attempt by defendant to commit a battery against him, or that defendant intentionally placed him in reasonable apprehension of receiving a battery. Id. at 102-21 (citing La. Rev. Stat. § 14:36; Fournette v. Tran, 792 So. 2d 870, 873 (La. App. 4th Cir. 2001)).

32.     "Ordinarily, the use of reasonable force to restrain an arrestee, protects a police officer from liability for assault or battery." <u>Lawrence v. St. Bernard Police Dep't</u>, No. 99-3494, 2003 WL 30419, at *6 (E.D. La. Jan. 3, 2003) (Duval, J.) (citing La. Code of Crim. Proc. 220 ("The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained."); <u>Ross v. Sheriff of Lafourche Parish</u>, 479 So. 2d 506, 511 (La. App. 1st Cir. 1985)); <u>accord</u> <u>Giardina v. Lawrence</u>, No. 07-6578, 2009 WL 1158857, at *3 n.7 (E.D. La. Apr. 29, 2009) (Berrigan, J.), <u>aff'd</u>, No. 09-30437, 2009 WL 4572837 (5th Cir. Dec. 7, 2009) (citing <u>Kyle v. City of New Orleans</u>, 353 So. 2d 969, 972 (La. 1977)); <u>Penn v. St. Tammany Parish Sheriff's Ofc.</u>, 843 So. 2d 1157, 1161 (La. App. 1st Cir. 2003).

33.     In this case, Deputy Martin's use of force, both threatened and actual, did not amount to assault or battery against plaintiff.  Plaintiff provoked the contact by refusing to answer Deputy Martin's questions, turning away, breaking away when Deputy Martin tried to frisk him, entering his cousin's Jeep, refusing to get out of the Jeep when ordered and telling his cousin to drive away.  The force employed by Deputy Martin in these circumstances was both necessary and reasonable.

34.     The pretrial order, Record Doc. No. 19, contains no claim in this case pursuant to <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658 (1978).  Accordingly,

there is no basis for liability as to plaintiff's federal claims against Sheriff Gusman, and the federal claims are dismissed as to Sheriff Gusman on that basis.

35.     Deputy Martin is not liable on the state law claims of assault and battery. Therefore, Sheriff Gusman, as Deputy Martin's employer, cannot be vicariously liable under Louisiana law for any torts committed by his employee while acting within the course and scope of his employment.  La. Civ. Code art. 2320; <u>Burge v. Parish of St. Tammany</u>, 187 F.3d 452, 469 (5th Cir. 1999); <u>Hill v. Sheriffs Ofc. Iberia Parish</u>, No. 07-1607, 2008 WL 5156464, at *5 (W.D. La. Oct. 20, 2008) (Hill, M.J.); <u>Carter v. Brumfield</u>, No. 98-3414, 1999 WL 705549, at *3 (E.D. La. Sept. 9, 1999) (Duval, J.). Accordingly, plaintiff's claims, if any, that Sheriff Gusman is vicariously liable for the state law torts of assault and battery are dismissed.

36.     Defendants are entitled to recover their costs pursuant to Fed. R. Civ. P. 54(d)(1).

## **CONCLUSION**

To whatever extent any part of the foregoing conclusions of law constitute findings of fact, and vice versa, they are adopted as such.

For all of the foregoing reasons, judgment will be separately entered in accordance with these findings of fact and conclusions of law.

New Orleans, Louisiana, this _____3rd_____ day of March, 2010.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE